**FILED**

JUN 2 1 2006

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| Avery Dennison Corporation, | ) |
| Plaintiff, | ) )  **06CV3390** |
| v. | ) ) **JUDGE GRADY** |
| Michael A. Naimo, | ) ) **MAG. JUDGE  MASON** |
| Defendant. | ) ) |

## COMPLAINT

Plaintiff Avery Dennison Corporation ("Avery Dennison"), by its attorneys, complains against defendant Michael A. Naimo as follows.

### THE PARTIES

1.      Plaintiff Avery Dennison is a Delaware Corporation with its principal place of business in Pasadena, California. Avery Dennison develops, manufactures and markets a wide range of label and related products for consumer and industrial markets.  One of those businesses is known as Retail Information Services. Retail Information Services manufactures, sources and sells a wide variety of tags, labels and packaging products to garment manufacturers and retailers.

2.      Defendant Michael A. Naimo is a resident of Hinsdale, Illinois.  Until December 12, 2005, Avery Dennison employed Naimo as Regional Sales Director -- Central for the Company's Retail Information Services segment.

## JURISDICTION AND VENUE

3.　　There is subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). The Parties are of diverse citizenship. The amount in controversy exceeds $75,000.

4.　　A substantial part of the events giving rise to the claims alleged in this Complaint occurred within the Northern District of Illinois.

5.　　Defendant is subject to personal jurisdiction in the Northern District of Illinois. Venue in the Northern District of Illinois is proper pursuant to 28 U.S.C. § 1391(a).

## FACTS

6.　　Effective as of December 12, 2005, Avery Dennison and Naimo entered into a Separation Agreement and General Release ("Separation Agreement,") a true and correct copy of is which attached to this Complaint as Exhibit 1 and is incorporated herein by reference.

7.　　In the Separation Agreement, Avery Dennison agreed to make substantial payments to Naimo for the balance of 2005 and for an additional period of twenty-four months.

8.　　In return for these payments, Naimo agreed, among other things, not to: " . . . reveal or disclose, sell, use, lecture upon, or publish any such Trade Secrets [as defined in the Separation Agreement], or authorize anyone else to do so at any time subsequent to his/her employment with Avery." (Exhibit 1, Sec. 9.)

9.　　Avery Dennison has, over the years, developed trade secret and confidential information through the investment of significant time, effort, and expense to establish and build its customer relationships. Such information includes, but is not limited to, business plans and strategies, the identity of manufacturers that historically have satisfied customers, pricing practices, profit margins, customer purchasing patterns, areas of certain customers' historical satisfaction and dissatisfaction, and methods for becoming a certified supplier of certain customers. Avery Dennison has taken reasonable steps to protect the secrecy of its trade secret

2

and confidential information, such as requiring employees to sign confidentiality agreements and limiting access. The use or disclosure of such information, which is not generally available to Avery Dennison's competitors through legitimate means, would be harmful to Avery Dennison.

10. Naimo specifically acknowledged, in the Separation Agreement, that his contractual obligation not to use or disclose Avery Dennison's confidential and trade secret information extended broadly, and included information concerning Avery Dennison's "operations, its future plans and its methods of doing business, including without limitation, proprietary information concerning its products, product development, customers, research, technology, financial circumstances, marketing, pricing, costs, compensation, and other matters." (Exhibit 1, Sec. 9.)

11. In Sections 6 and 7 of his Employment Agreement with RVL Packaging, Inc. (a wholly owned subsidiary of) Avery Dennison ("Employment Agreement"), Naimo further agreed not to compete with Avery Dennison for a period of twelve months after his separation from the Company, and not to use or disclose the Company's confidential/trade secret information. A true and correct copy of the Employment Agreement is attached to this Complaint as Exhibit 2 and is incorporated herein by reference.

12. Avery Dennison has made all required payments to Naimo, through June 14, 2006. Avery Dennison has otherwise fully complied with all its obligations under the Separation Agreement and the Employment Agreement.

13. Avery Dennison recently learned that Naimo has breached his obligations under the Separation Agreement and the Employment Agreement by making sales calls to the very accounts he had managed for Avery Dennison. In that process, he has and continues to

3

wrongfully use, intentionally and/or inevitably, the trade secrets and confidential information of Avery Dennison.

14.     Upon information and belief, Naimo's breach of the Separation Agreement and the Employment Agreement, and his wrongful competition are made in conjunction with other entities and/or individuals, the full scope of which is not yet known. Naimo himself stated that he is competing with Avery Dennison, and the "varsity team" is back on the field. He has refused, however, to provide more detailed information as to his activities. Avery Dennison has obtained computer forensic evidence indicating wrongful accessing and copying of trade secrets and confidential information. Avery Dennison expects to add parties and claims to this action.

## COUNT I - DECLARATORY JUDGMENT

15.     The allegations of Paragraphs 1 - 14 of this Complaint are restated and incorporated into this Count I by reference.

16.     The Separation Agreement does not specify whether or not Avery Dennison is obligated to continue making payments when Naimo is in breach of the Agreement.

17.     Naimo continues to assert that he should be receiving payments.

18.     Because Naimo has failed and refused to comply with his obligations under the Separation Agreement, Avery Dennison should not be obligated to provide Naimo any further payments under the Separation Agreement.

## COUNT II - BREACH OF CONTRACT

19.     The allegations of Paragraphs 1 - 18 of this Complaint are restated and incorporated into this Count II by reference.

20.     Effective as of December 12, 2005, Avery Dennison and Naimo entered into the Separation Agreement.

4

21.     Avery Dennison has performed all its obligations under the Separation Agreement.

22.     Naimo has breached his obligations under the Separation Agreement by intentionally and/or inevitably using and continuing to use Avery Dennison's confidential and trade secret information.

23.     Avery Dennison has suffered damages due to Naimo's breach.

## COUNT III - ILLINOIS TRADE SECRETS ACT

24.     The allegations of Paragraphs 1 - 23 of this Complaint are restated and incorporated into this Count III by reference.

25.     Naimo obtained Avery Dennison's "trade secrets" within the meaning of Section 2(d) of the Illinois Trade Secrets Act, 765 ILSC 1065/2(d).

26.     In calling upon the accounts he served while working for Avery Dennison, Naimo has been and inevitably will continue to use Avery Dennison's trade secrets.

27.     Naimo has misappropriated and inevitably will misappropriate Avery Dennison's trades secrets within the meaning of Section 2(d) of the Illinois Trade Secrets Act, 765 ILSC 1065/2(b).

28.     Avery Dennison has suffered damages due to Naimo's use of its trade secrets.

29.     Naimo was aware of the confidential nature of Avery Dennison's trade secrets, and of his duty not to use Avery Dennison's trade secrets for his own benefit or for the benefit of any other person or entity. Therefore, the misappropriating of Avery Dennison's trade secrets by Naimo has been willful and malicious.

## COUNT IV - BREACH OF CONTRACT - EMPLOYMENT AGREEMENT

30.     The allegations of Paragraphs 1 - 29 of this Complaint are restated and incorporated into this Count IV by reference.

5

31.　On or about June 1, 2003, Avery Dennison and Naimo entered into the Employment Agreement.

32.　Avery Dennison has performed all its obligations under the Employment Agreement.

33.　Naimo has breached his obligations under Section 7 of the Employment Agreement, by competing during the twelve month period immediately after the termination of his employment.

34.　Naimo has breached his obligations under Section 6 of the Employment Agreement, by using, intentionally and/or inevitably, Avery Dennison's confidential and trade secret information.

35.　The scope of the noncompetition provisions of the Employment Agreement are reasonable, and in the event that the Court deems any aspect of the noncompetition provisions of the Employment Agreement to be overly broad, the Court should modify or "blue-pencil" these provisions to the maximum scope deemed reasonable by the Court, pursuant to the parties' request in Section 7(c) of the Employment Agreement.

36.　The noncompetition provisions of the Employment Agreement are necessary to protect Avery Dennison's legitimate protectable interests in its confidential information and in its near-permanent customer relationships.

37.　In the Employment Agreement, Naimo acknowledged and agreed that a breach of Section 6 or 7 "would cause irreparable damage to the Company." (Exhibit 2, Sec. 9).

38.　Avery Dennison has additionally suffered damages due to Naimo's breach.

6

## Relief Requested

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.    As to Count I:

    i.    Issue a Declaratory Judgment in favor of Avery Dennison, declaring that Avery Dennison is not obligated to make any further payments to Naimo under the Separation Agreement.

B.    As to Count II:

    i.    Award damages against Naimo, including the amount of the payments Naimo received to date under the Separation Agreement, plus additional amounts to be proven at trial; and

    ii.    Award preliminary and thereafter permanent injunctive relief against Naimo from soliciting or serving customers he served or managed during his final year of employment with Avery Dennison, and from using or disclosing Avery Dennison's trade secret and confidential information.

C.    As to Count III:

    i.    Award damages against Naimo, in amounts to be proven at trial;

    ii.    Award preliminary and thereafter permanent injunctive relief against Naimo from soliciting or serving customers he served or managed during his final year of employment with Avery Dennison, and from using or disclosing Avery Dennison's trade secret and confidential information; and

    iii.    Award exemplary damages and attorneys' fees to Avery Dennison, pursuant to Section 4(a) of the Illinois Trade Secrets Act, 765 ILCS 1065/4(a).

D.    As to Count IV:

    i.    Award damages against Naimo, including the amount of the payments Naimo received to date under the Separation Agreement, plus additional amounts to be proven at trial; and

    ii.    Award preliminary and thereafter permanent injunctive relief against Naimo from soliciting or serving customers he served or managed during

7

his final year of employment with Avery Dennison, and from using or disclosing Avery Dennison's trade secret and confidential information.

E. As to all Counts, award costs and such further relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

AVERY DENNISON CORPORATION,

By: _____
One of Its Attorneys

Ross B. Bricker
David K. Haase
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: 312 222-9350
Facsimile: 312 840-7710
dhaase@jenner.com

Kenneth D. Schwartz
Avery Dennison Corporation
7590 Auburn Road, Bldg. 16
Painesville, OH 44077
Telephone: 440 358-4895
Facsimile: 440 358-4773
Kenneth.Schwartz@averydennison.com

Dated: June 21, 2006

8

## SEPARATION AGREEMENT AND GENERAL RELEASE

This Separation Agreement and General Release ("Agreement") is made by and between Michael Naimo ("Employee") and Avery Dennison Corporation, a Delaware corporation ("Avery") effective this 12th day of December, 2005.

Employee is currently party to an Employment Agreement with RVL Packaging, Inc. ("RVL"). RVL is a wholly-owned subsidiary of Avery. RVL has assigned to Avery, and Avery has accepted from RVL, all of RVL's rights and obligations under the Employment Agreement. Employee and Avery agree to the following terms in full and final settlement of all matters relating to or arising out of Employee's employment and separation from employment with Avery and/or RVL:

1.    Employee's employment with Avery shall end as of December 12, 2005.

2.    It is agreed that, for the promises made herein, Employee will receive the following consideration:

The applicable payments set forth in Section 5(c) of the Employment Agreement, dated September 1, 2003, by and between RVL Packaging, Inc. and Employee. You will be eligible for benefit continuation under COBRA provided you pay 102% of the applicable premiums.

3.    Avery will deduct from the payments made under Paragraph 2 the required tax withholdings.

4.    Employee represents that he/she has carefully read and fully understands all the provisions of this Agreement and has had an adequate opportunity to discuss all aspects of this Agreement with an attorney of his/her own choosing, if desired.

5.    Employee and his/her successors, assigns, heirs and legal representatives, hereby releases, acquits, and forever discharges:

Avery and its representatives, parent and subsidiary corporations (as the case may be), predecessors, successors, affiliates, officers, agents, assigns, employees and attorneys, from any and all claims, rights, expenses, debts, demands, costs, contracts, liabilities, obligations, actions, and causes of action of every nature, known or unknown, whether in law or in equity, which he/she had, now has, or may have which are in any way connected with, or arise out of, any cause whatsoever, from the beginning of time to the date of this Agreement; *provided, however,* that such release shall not extend to (a) the rights created by this Agreement; and (b) Employee's rights to indemnification, if any, as an officer or employee of Avery pursuant to Avery's certificate of incorporation, bylaws or applicable law (collectively, the matters to which this release does not extend, as set forth in clauses (a) and (b) being referred to herein as the "Continuing Obligations").

Except for the Continuing Obligations, such release includes, but is not limited to, any and all matters relating to Employee's employment with Avery. Employee specifically releases

Separation Agreement and General Release
Michael Naimo

and discharges, but not by way of limitation, any obligation, claim, demand or cause of action based on, or arising out of, any alleged wrongful termination, breach of employment contract, breach of implied covenant of good faith and fair dealing, workers' compensation, defamation, intentional or negligent infliction of emotional distress, or discrimination based on race, national origin, sex, religion, age or handicap.

Employee also specifically releases and discharges any and all claims, rights and/or remedies under the Age Discrimination in Employment Act of 1967 as amended, the Employment Retirement Income Security Act of 1974 as amended, and any other federal, state or local statute or regulation which relates to his/her employment or its termination.

Employee agrees to file no suit or other action alleging any such claim, demand or cause of action.

8. Employee agrees not to disclose, or discuss with, any person (other than his/her spouse, attorney and tax or other financial advisor) any of the terms and conditions of this Agreement, except as may be required by law or regulation, and except as may be required to effectuate the terms of this Agreement. Disclosure of any term of this Agreement will constitute a material breach of the Agreement.

9. Employee understands and agrees that in the course of employment with Avery, he/she may have acquired confidential information and trade secrets concerning Avery's operations, its future plans and its methods of doing business, including, without limitation, proprietary information about its products, product development, customers, research, technology, financial circumstances, marketing, pricing, costs, compensation and other matters (hereinafter collectively "Trade Secrets"). Employee may not reveal or disclose, sell, use, lecture upon, or publish any such Trade Secrets, or authorize anyone else to do so at any time subsequent to his/her employment with Avery. All Avery documents, files, lists and other information of a business nature, whether in hard copy or machine readable form, will be returned to Avery by Employee forthwith, and any future use of same by Employee is prohibited.

10. This Agreement shall be governed by and interpreted and construed in accordance with the laws of the State of Illinois. If any provision of this Agreement shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid or unenforceable, in whole or in part, such judgment shall not affect, impair or invalidate the remainder of the Agreement.

11. Neither the negotiation, undertaking or signing of this Separation Agreement and General Release constitutes or operates as an acknowledgement or admission that Avery, or any person acting on behalf of Avery, has violated or failed to comply with any provision of federal or state constitution, statute, law, regulation, municipal ordinance or principle of common law.

Separation Agreement and General Release
Michael Naimo

12.     This Agreement is the only and complete agreement between Employee and
Avery on or in any way relating to the subject matter hereof, and supersedes all previous
agreements, including, without limitation, the Employment Agreement, except to the extent such
Employment Agreement (and the payment obligation set forth therein) is specifically referenced
in Section 2 of this Agreement. Notwithstanding the previous sentence, the following sentence
in Section 5(c) shall be of no force or effect: "Any severance payments otherwise due to the
Executive under this Section 5(c) shall be reduced by the gross amount of compensation payable
to the Executive during the Severance Period for any work, employment or business activity
whatsoever, including self-employment or consulting." No statements, promises or
representations have been made by either party to the other and no consideration has been or is
offered, promised or expected other than that already received or described in this Agreement.

13.     The language of all parts of this Agreement shall in all cases be construed as a
whole, according to its fair meaning, and not strictly for or against either party. This Agreement
may be executed in counterparts, all of which taken together shall constitute one and the same
instrument.

14.     From the date Employee receives this Agreement, he/she has twenty-one (21)
days to consider it. Should Employee decide to sign the Agreement, he/she has seven (7) days
following the signing to revoke the Agreement, and the Agreement will not become effective and
enforceable until that seven (7) day period has expired. Should Employee either decide not to
sign this Agreement or should he/she sign it and elect to revoke it during the seven (7) day
period, then this Agreement shall be null and void. Employee understands his/her right to
consult with an attorney prior to signing this Agreement and has been advised by Avery to do so.

IN WITNESS WHEREOF this Separation Agreement and General Release has been
executed by the parties.

Dated:     _1-17-06_

By:     _____
        Michael Naimo

AVERY DENNISON CORPORATION

By: _____

Title _____

3

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("Agreement") is entered into as of this 1st day of September, 2003 (the "Effective Date"), by and between RVL Packaging, Inc., a California corporation (the "Company"), and Michael A. Naimo (the "Executive") (individually, a "Party" and collectively, the "Parties").

## RECITALS

A.    The Company wishes the Executive to serve as an employee of the Company in the capacity and on the terms and conditions set forth in this Agreement, and the Executive is willing to accept such employment on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual agreements, covenants and promises herein contained, the Parties hereto agree as follows:

1.    **Employment and Duties.**

(a)    During the Employment Period (as hereinafter defined), the Company agrees to employ the Executive upon the terms and conditions set forth in this Agreement, and the Executive accepts such employment and agrees to serve the Company, as the Regional Sales Director—Central of the Company.  The Executive shall report to the V.P., Sales, or such other representative of the Company as the Company may designate from time to time (the "Company Representative").  In such capacity, the Executive shall be responsible for the sales function for apparel/retail promotional and informational tickets, tags, and woven and printed labels (collectively, "Products") in Illinois, Indiana, Iowa, Kansas, Missouri, North Dakota, South Dakota, Nebraska, Minnesota, Wisconsin, Alabama (Saks), Kentucky (Fruit of the Loom), Michigan (Wolverine and Meijer), and Tennessee (Kellwood, Tractor Supply and Nashville) (the "Territory"), including, without limitation, managing the Company's sales representatives in the Territory, and shall have such other powers and duties as may from time to time be established by the Company Representative.

(b)    The Executive shall (i) perform well and faithfully such duties as may be assigned by the Company Representative, (ii) devote his full working time, attention and energies to the business and affairs of the Company, and (iii) use his best efforts to advance the interests of the Company, to improve the value of the Company and to grow the Company's business on a global basis.

(c)    Immediately following the termination of the Executive's employment with the Company, the Executive shall return to the Company all records, files, lists, including computer-generated lists, electronic files, drawings, notes, notebooks, letters, handbooks, blueprints, manuals, sketches, specifications, formulas, financial documents, sales and business plans, customer lists, lists of customer contacts, pricing information, computers, software, cellular phones, credit cards, keys, equipment and similar items relating to the business of the Company and its affiliates, including, without limitation, Avery Dennison Corporation (the "Company Group"), together with any other property of the Company Group or property which the Executive received in the course of the Executive's employment with the Company Group.

2. **Term.** The term of this Agreement shall expire on the earlier of (i) December 31, 2007 or (ii) the date upon which a Termination Event (as described in Section 5) occurs (the "Employment Period"). Except as expressly provided in Section 5(c) below, all of the obligations of the Company under this Agreement shall terminate at the end of the Employment Period. Notwithstanding the end of the Employment Period or termination of this Agreement for any reason, the provisions of Sections 5, 6, 7, and 8 below shall survive in accordance with their terms.

3. **Compensation.**

(a) **Annual Compensation.** The Executive's annual compensation during the Employment Period shall be equal to (a) One and Twenty-Five Hundredths of One Percent (1.25%) of the Company's "Net Sales" of Products in the Territory for the first One Hundred Million Dollars ($100,000,000) of Net Sales per fiscal year and (b) One Percent (1.0%) of the Company's Net Sales of Products in the Territory for Net Sales in excess of One Hundred Million Dollars ($100,000,000) per fiscal year (the "Annual Compensation"). Such compensation shall be paid monthly. "Net Sales" shall mean gross sales, less applicable discounts, returns and allowances, in each case as determined in accordance with generally accepted accounting principles in the United States.

(b) **Automobile Allowance.** During the Employment Period, the Executive shall be entitled to an automobile allowance of Eight Hundred Dollars ($800) per month, notwithstanding anything to the contrary which may be contained in any of the plans or arrangements governing Benefits Plans (as defined in Section 4).

4. **Benefits.** From the Effective Date to the expiration of the Employment Period, the Executive and his eligible dependents shall be entitled to participate in, and receive benefits under, any health, disability, medical, insurance or other employee welfare plan or arrangement (each, a "Benefit Plan") made generally available by the Company to its salaried employees during the Employment Period, except that the Executive shall not be eligible to participate in any severance plan offered by the Company other than the severance payments described in Section 5(c).

5. **Termination Events.**

(a) **Disability or Death.** If the Executive becomes, in the good faith opinion of the Company, unable to discharge the essential functions of the Executive's job on a full-time basis, with or without reasonable accommodation, for a period of more than three (3) consecutive months or for more than ninety (90) calendar days in the aggregate during any twelve month period because of physical or mental impairment or incapacity, whether by reason of accident, sickness or otherwise ("disability"), then the Company may give Notice (as defined in Section 10 below) to the Executive terminating his employment hereunder. The date such Notice of disability is given by the Company shall be a Termination Event. If the Executive dies prior to the termination of his employment, the date of such death shall be a Termination Event.

(b) **Termination for Cause.** If the Executive's employment is terminated "for cause" (as defined below), the Termination Event shall be on the date upon which the Company gives Notice to the Executive of such termination (subject to the cure right, if any,

2

described in subsection (iv) below). As used herein, "for cause" shall mean (i) conviction of or plea of guilty or nolo contendere to a crime involving moral turpitude or a crime punishable by a term of imprisonment greater than six (6) months; (ii) any act of fraud, dishonesty, material misconduct, gross negligence or breach of fiduciary duty by the Executive; (iii) a breach by the Executive of Sections 6, 7 or 8 of this Agreement; or (iv) a failure by the Executive to follow the reasonable instructions of the Company Representative, given in good faith, in any material respect (or repeated failures to follow such instructions in any respect) or other neglect of a material nature (or repeated neglect, even if not material in nature) by the Executive in the performance of his duties, after being given Notice of such failure or neglect, subject to an opportunity to cure within ten (10) calendar days, if in the good faith opinion of the Company such failure or neglect is capable of being cured (in which case the Termination Event shall not take place until the end of the cure period if the failure or neglect has not been cured within such cure period).

(c)     **Termination Not for Cause.**     If the Executive's employment is terminated by the Company before the end of the Employment Period not "for cause" (i.e., for any reason other than as set forth in Sections 5(a), 5(b) and 5(d)), the Termination Event shall be on the date upon which the Company gives Notice to the Executive of such termination. In such event and only in such event, provided the Executive signs a waiver and release of all claims against the Company in the form attached hereto as Exhibit "A", within twenty-one (21) days after the Company presents such waiver and release to the Executive, and the Executive does not revoke that waiver and release within seven (7) days after such execution, he shall receive severance payments equal to the Annual Compensation received by the Executive for the fiscal year prior to the Termination Event (payable at such intervals as salaries are paid generally to salaried employees of the Company) for the period following such Termination Event until the earlier of (i) December 31, 2007 or (ii) the date of death of the Executive (the "Severance Period"). Any severance payments otherwise due to the Executive under this Section 5(c) shall be reduced by the gross amount of compensation payable to the Executive during the Severance Period for any work, employment or business activity whatsoever, including self-employment or consulting. In the event that the Executive's employment is terminated as described under Sections 5(a), 5(b) or 5(d), the Executive (or his heirs or representatives) shall not be entitled to any severance payments.

(d)     **Termination by the Executive.**     If the Executive unilaterally terminates his employment with the Company prior to the end of the Employment Period, such termination shall constitute a Termination Event.

6.     **Disclosure of Information.** The Executive acknowledges that the trade secrets, private or secret processes as they exist from time to time, and information concerning products, developments, manufacturing techniques, new product plans, equipment, inventions, discoveries, patent applications, ideas, designs, engineering drawings, sketches, renderings, other drawings, manufacturing and test data, computer programs, progress reports, materials, costs, specifications, processes, methods, research, procurement and sales activities and procedures, promotion and pricing techniques and credit and financial data concerning customers of the Company Group, as well as information relating to the management, operation or planning of the Company Group (the "Proprietary Information"), are valuable, special and unique assets of the Company Group, access to and knowledge of which are essential to the performance of the

3

Executive's duties hereunder. In light of the highly competitive nature of the industries in which the members of the Company Group conduct their respective businesses, the Executive agrees that all Proprietary Information heretofore or in the future obtained by the Executive as a result of the Executive's association with the Company Group shall be considered confidential. In recognition of this fact, the Executive agrees that he will not, during and after the Employment Period, without the Company's prior written consent, or except as required by law, such law to be confirmed by a legal opinion, disclose any of such Proprietary Information to any person or entity for any reason or purpose whatsoever and he will not make use of any Proprietary Information for his own purposes or for the benefit of any person or entity (except the Company Group) under any circumstances. The term Proprietary Information shall not, however, include such part of the Proprietary Information which (i) is or became generally available to the public other than as a result of a disclosure by the Executive or (ii) becomes available to the Executive following the end of the Employment Period on a non-confidential basis from a source other than members of the Company Group or their respective agents which is not prohibited from disclosing such information to the Executive by a legal, contractual or fiduciary obligation to the Company Group.

7. **Preservation of Corporate Opportunity.** In order to further protect the confidentiality of the Proprietary Information and customer relationships and in recognition of the highly competitive nature of the industries and broad geographic scope in which members of the Company Group conduct their respective businesses, and for the consideration set forth in Sections 3 and 4 above, the Executive further agrees as follows:

(a) The Executive will not, during the Employment Period and for a period of twelve (12) months thereafter (which period shall be tolled during any period of noncompliance with his obligations under this section) (the "Applicable Period"), directly or indirectly, own (other than as a stockholder of less than one percent (1%) of the issued and outstanding stock of a publicly-held corporation), manage, operate, join, control or participate in the ownership, management, operation or control of, or be connected as a director, officer, employee, partner, consultant or otherwise with, any profit or non-profit business or organization in any county, state or territory of the United States or anywhere else in the world, which (i) competes with the Company Group's business of designing, developing, manufacturing, selling, and marketing apparel/retail promotional and informational tickets, tags and woven and printed labels or (ii) develops, designs, produces or markets goods or services that compete or are being developed to compete with goods or services produced or marketed by the Company Group's Retail Information Services business.

(b) The Executive will not, during the Applicable Period, directly or indirectly, induce employees, agents or representatives of any members of the Company Group to engage in any activities hereby prohibited to the Executive or to terminate their employment or other relationship with any member of the Company Group.

(c) In the event that the agreement in this Section 7 shall be determined by any court of competent jurisdiction to be unenforceable by reason of its extending for too great a period of time or over too great a geographical area or by reason of its being too extensive in any other respect, it shall be interpreted to extend only over the maximum period of time for which it may be enforceable, and/or over the maximum geographical area as to which it may be

4

enforceable and/or to the maximum extent in all other respects as to which it may be enforceable, all as determined by such court in such action.

8.     **Designs, Inventions, Patents and Copyrights.** All designs, inventions, trade names, domain names, improvements, technical information, know-how and technology, and suggestions created, invented, conceived or reduced to practice by the Executive while the Executive is employed by the Company Group (whether or not (a) during usual working hours, (b) on or off the premises of the Company Group or (c) alone or with others) that are directly or indirectly related to the Company Group's business ("Intellectual Property") shall be the property of the Company, and the Executive promptly shall disclose the same to the Company. The Parties hereto intend that all such Intellectual Property is and shall be considered "works made for hire," as such term is defined under the United States copyright law. The Executive hereby transfers and assigns to the Company all right, title and interest in, to and under such Intellectual Property and, at the request and expense of the Company, the Executive agrees to cooperate in the preparation of, prosecution of, and litigation under, and to execute and deliver to the Company, all applications for patents, design patents or reissue of patents and specific assignments of such applications, and all applications for registration of copyright, trademark or service mark with respect to such Intellectual Property, and all instruments of assignment or transfer necessary to vest title to such Intellectual Property in the Company in the Untied States and abroad. This provision shall survive the termination of this Agreement for all Intellectual Property created during the Employment Period or during any period prior thereto when the Executive worked for an affiliate of the Company Group.

9.     **Remedies.** The Executive acknowledges and agrees that his breach of Sections 6, 7 and 8 of this Agreement would cause irreparable damage to the Company and that the Company would not have an adequate remedy at law. Therefore, the obligations of the Executive under Sections 6, 7 and 8 of this Agreement, shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for by the Company, without posting any bond or other security, and granted in connection therewith. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which the Company may have under this Agreement or otherwise.

10.     **Notices.** All notices, requests, approvals, consents, demands, claims and other communications required or permitted to be given under this Agreement (individually and collectively, "Notices") shall be in writing and shall be served personally, or sent by a national overnight delivery or courier company, or by United States registered or certified mail, postage prepaid, return receipt requested, and addressed as follows:

If to the Company, to:

RVL Packaging, Inc.
c/o Avery Dennison Corporation
150 North Orange Grove Boulevard
Pasadena, California 91103
Attention: General Counsel
Telecopier:     (626) 304-2071

5

If to the Executive, to:

Michael A. Naimo
340 Forest Road
Hinsdale, IL 60521

Any such Notices shall be deemed delivered upon delivery or refusal to accept delivery as indicated in writing by the Person attempting to make personal service, on the U.S. Postal Service return receipt, or by similar written advice from the overnight delivery company. Each Party hereto shall make an ordinary, good faith effort to ensure that it will accept or receive Notices that are given in accordance with this Section, and that any Person to be given Notice actually receives such Notice. Any Party to whom Notices are to be sent pursuant to this Agreement may from time to time change its address for future communication hereunder by giving Notice in the manner prescribed herein to all other Parties hereto, provided that the address change shall not be effective until five (5) Business Days after the Notice of change has been given.

11. **Binding Effect; Successors and Assigns.** This Agreement shall inure to the benefit of and shall be binding upon the heirs, executors, administrators, successors and legal representatives of the Executive, and shall inure to the benefit of and be binding upon the Company and its successors and assigns. Specifically, and without limitation, the Company may assign or transfer this Agreement to any affiliate, subsidiary, successor or purchaser (whether of assets or stock), without causing any "termination" either of this Agreement or of Executive's employment and Executive shall be fully bound to perform the obligations set forth herein following such assignment or transfer. Notwithstanding the foregoing, the obligations of the Executive may not be delegated and the Executive may not assign, transfer, pledge, encumber, hypothecate or otherwise dispose of this Agreement, or any of his rights or payments due hereunder, and any such attempted delegation or disposition shall be null and void and without effect.

12. **Attorney's Fees.** Each Party in any litigation or arbitration involving the Agreement shall bear its or their respective costs, expenses and attorneys' fees; provided, however, that if the court or arbitrator(s) determines that there is one prevailing Party, then such Party shall be entitled to receive its costs and expenses, including reasonable attorneys' fees.

13. **Governing Law.** The validity, construction and interpretation of this Agreement shall be governed by the substantive laws of the State of Illinois without regard to conflict of laws principles.

14. **Submission to Jurisdiction; Consent to Service of Process.** The Parties hereto hereby irrevocably submit to the exclusive jurisdiction of any federal or state court located within the State of Illinois over any dispute arising out of or relating to this Agreement and each Party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action, or proceeding related thereto may be heard and determined in such courts. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable laws, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties

6

hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable laws.

15.     **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each one of which shall be deemed an original, but all of which shall constitute one and the same instrument.

16.     **Construction; Interpretation.** Wherever possible, the terms of this Agreement shall be construed and interpreted so as to be effective and valid under applicable law. If any provision of this Agreement shall be deemed invalid or prohibited under applicable law, such provision shall be invalid or prohibited only to the extent of such invalidity or prohibition. The headings of the various sections are for convenience only and shall not control or affect the meaning or construction or limit the scope or intent of any of the provisions of this Agreement.

17.     **Entire Agreement; Waiver.** This Agreement contains the entire agreement of the Parties relating to the subject matter hereof, supersedes and replaces in its entirety any existing employment agreement of the Executive and may not be waived, changed, modified, extended or discharged orally but only by agreement in writing signed by the Party against whom enforcement of any such waiver, change, modification, extension or discharge is sought. The waiver by either Party (the "Nonwaiving Party") of a breach of any provision of this Agreement by the other Party (the "Breaching Party") shall not operate or be construed as a waiver by the Nonwaiving Party of a breach of any other provision of this Agreement or of any subsequent breach by the Breaching Party of the same provision or any other provision.

18.     **Deductions and Withholding.** The Executive agrees that the Company shall withhold from any and all payments required to be made to the Executive pursuant to this Agreement, all federal, state, local and/or other taxes which the Company determines are required to be withheld in accordance with applicable statutes and/or regulations from time to time in effect.

19.     **No Conflict.** The Executive represents and warrants that the execution, delivery and performance of this Agreement by the Executive will not violate any agreement, undertaking or covenant to which the Executive is party or is otherwise bound.

20.     **Effect.** No provision of this Agreement shall be deemed to affect or prohibit the Company's right to transfer assets among, merge, or undertake any other form of corporate restructuring with respect to any of the entities within the Company Group.

21.     **Confidentiality.** Executive agrees not to disclose, or discuss with, any person (other than his/her spouse, attorney and tax or other financial advisor) any of the terms and conditions of this Agreement, except as may be required by law or regulation, and except as may be required to effectuate the terms of this Agreement. Disclosure of any term of this Agreement will constitute a material breach of the Agreement.

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

RVLA PACKAGING, INC.

_____
Michael A. Naimo

By: _____

Its: _____

8

## EXHIBIT A

### FORM OF SEPARATION AGREEMENT AND GENERAL RELEASE

This Separation Agreement and General Release ("Agreement") is made by and between _____ ("Employee") and Avery Dennison Corporation, RVL Packaging, Inc. or another subsidiary of Avery Dennison Corporation (to the extent it is the employer of Employee immediately prior to the execution of this Agreement; Avery Dennison Corporation, RVL Packaging, Inc. or such other subsidiary of Avery Dennison Corporation shall be referred to herein in such capacity as "Avery") effective this _____ day of _____, _____.

Employee and Avery agree to the following terms in full and final settlement of all matters relating to or arising out of Employee's employment and separation from employment with Avery:

1.    Employee's employment with Avery shall end [has ended] as of _____, _____.

2.    It is agreed that, for the promises made herein, Employee will receive the following consideration:

(a)    The applicable payments set forth in Section 5(c) of the Employment Agreement, dated May 1, 2003, by and between RVL Packaging, Inc. and Employee (the "Employment Agreement").

3.    Avery will deduct from the payments made under Paragraph 2 the required tax withholdings.

4.    This Agreement shall be rendered null and void in the event that Employee is offered a transfer into a comparable position at another Avery facility, department or unit, or in the event that Employee accepts a transfer into another position (regardless of whether it is a comparable position) at the same or another Avery facility, department or unit. For purposes of this paragraph 4, "comparable" shall mean within 50 miles of Employee's residence, with reasonably similar benefits and other terms and conditions of employment; provided Employee's compensation as set forth in Section 3(b) of the Employment Agreement is not reduced.

5.    In the event Employee accepts an offer of reemployment with Avery during the severance period, such offer shall be conditioned upon Employee's repayment of all or part of the severance benefits previously paid under the terms of this Agreement. For purposes of this paragraph 5, "severance period" shall mean the period of time following termination of employment, over which an amount equivalent to the total severance benefit dollar amount would have been received by Employee as regular compensation of Employee had Employee remained employed in Employee's current position at the time of termination.

6.    Employee represents that he/she has carefully read and fully understands all the provisions of this Agreement and has had an adequate opportunity to discuss all aspects of this Agreement with an attorney of his/her own choosing, if desired.

9

7.    Employee and his/her successors, assigns, heirs and legal representatives, hereby releases, acquits, and forever discharges:

Avery and its representatives, parent and subsidiary corporations (as the case may be).

Employee also specifically releases and discharges any and all claims, rights and/or remedies under the Age Discrimination in Employment Act of 1967 as amended, the Employment Retirement Income Security Act of 1974 as amended, and any other federal, state or local statute or regulation which relates to his/her employment or its termination.

Employee agrees to file no suit or other action alleging any such claim, demand or cause of action.

8.    Employee agrees not to disclose, or discuss with, any person (other than his/her spouse, attorney and tax or other financial advisor) any of the terms and conditions of this Agreement, except as may be required by law or regulation, and except as may be required to effectuate the terms of this Agreement. Disclosure of any term of this Agreement will constitute a material breach of the Agreement.

9.    Employee understands and agrees that in the course of employment with Avery, he/she may have acquired confidential information and trade secrets concerning Avery's operations, its future plans and its methods of doing business, including, without limitation, proprietary information about its products, product development, customers, research, technology, financial circumstances, marketing, pricing, costs, compensation and other matters (hereinafter collectively "Trade Secrets"). Employee may not reveal or disclose, sell, use, lecture upon, or publish any such Trade Secrets, or authorize anyone else to do so at any time subsequent to his/her employment with Avery. All Avery documents, files, lists and other information of a business nature, whether in hard copy or machine readable form, will be returned to Avery by Employee forthwith, and any future use of same by Employee is prohibited.

10

10.   This Agreement shall be governed by and interpreted and construed in accordance with the laws of the State of Illinois. If any provision of this Agreement shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid or unenforceable, in whole or in part, such judgment shall not affect, impair or invalidate the remainder of the Agreement.

11.   Neither the negotiation, undertaking or signing of this Separation Agreement and General Release constitutes or operates as an acknowledgement or admission that any party, or any person acting on behalf of any party, has violated or failed to comply with any provision of federal or state constitution, statute, law, regulation, municipal ordinance or principle of common law.

12.   This Agreement is the only and complete agreement between Employee and Avery on or in any way relating to the subject matter hereof. No statements, promises or representations have been made by either party to the other and no consideration has been or is offered, promised or expected other than that already received or described in this Agreement, including its attachment(s) [A (Benefits information)] [and B (Job Title/Age Report)] incorporated herein by this reference.

13.   The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against either party. This Agreement may be executed in counterparts, all of which taken together shall constitute one and the same instrument.

14.   From the date Employee receives this Agreement, he/she has twenty-one (21) days [forty-five (45) days if the termination arises out of a group exit incentive or layoff program] to consider it. Should Employee decide to sign the Agreement, he/she has seven (7) days following the signing to revoke the Agreement, and the Agreement will not become effective and enforceable until that seven (7) day period has expired. Should Employee either decide not to sign this Agreement or should he/she sign it and elect to revoke it during the seven (7) day period, then this Agreement shall be null and void. Employee understands his/her right to consult with an attorney prior to signing this Agreement and has been advised by Avery to do so.

IN WITNESS WHEREOF this Separation Agreement and General Release has been executed by the parties.


Dated: _____

By: _____

Title: _____
                    (Employee)

## AMENDMENT to EMPLOYMENT AGREEMENT

This AMENDMENT to EMPLOYMENT AGREEMENT ("Amendment") is entered into as of the 1st day of September, 2003 (the "Effective Date"), by and between RVL Packaging, Inc., a California corporation (the "Company"), and Michael A. Naimo (the "Executive") (individually, a "Party" and collectively, the "Parties").

### RECITALS

A.    The Company and the Executive have entered into the Employment Agreement, dated as of September 1, 2003 (the "Employment Agreement") and desire to amend it as set forth in this Amendment.

NOW, THEREFORE, in consideration of the mutual agreements, covenants and promises herein contained, the Parties hereto agree as follows:

1.    Section 3(a) of the Agreement shall be amended to read as follows:

"(a)    **Annual Compensation.**    The Executive's annual compensation during the Employment Period shall be equal to (a) One and Twenty-Five Hundredths of One Percent (1.25%) of the Company's "Net Sales" of Products in the Territory for the first One Hundred Million Dollars ($100,000,000) of Net Sales per fiscal year and (b) One Percent (1.0%) of the Company's Net Sales (defined below) of Products in the Territory for Net Sales in excess of One Hundred Million Dollars ($100,000,000) per fiscal year (the "Annual Compensation"). During the Employment Period, the Company shall pay to the Executive an amount equal to Twenty Thousand Eight Hundred Fifty Dollars ($20,850) per semi-monthly pay period (the "Draw"). At the end of each month during the Employment Period, the Company shall pay to the Executive the difference between the Annual Compensation earned during that month and the total Draw payments made during such month, provided that if such amount is a negative number, then the excess of the monthly Draw over the Annual Compensation earned during the month shall be carried over to the next month and offset against the Annual Compensation to be paid to the Executive in that month. Upon termination of the Agreement, if the aggregate Annual Compensation paid to the Executive during the term of the Agreement is less than the aggregate Draw paid to the Executive during the term of the Agreement, then the Executive shall pay such deficit to the Company upon termination. The Company shall be entitled, in its sole discretion, to offset all or part of such deficit against any payments due to the Executive upon termination. "Net Sales" shall mean gross sales, less applicable discounts, returns and allowances, in each case as determined in accordance with generally accepted accounting principles in the United States.

2.    All other provisions of the Amendment shall be remain in full force and effect.

3.    This Amendment may be executed simultaneously in two or more counterparts, each one of which shall be deemed an original, but all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

_____
Michael A. Naimo

RVL PACKAGING, INC.

By: _____

Its: _____